# 24-2947

## In the
## United States Court of Appeals
### For the Second Circuit



DR. ROBERT GLUCK, EMMA GLUCK and SARA GLUCK,

*Lead Plaintiffs-Appellants,*

– and –

JEFFREY H. BATTER, on behalf of themselves and all other similarly situated,
CHERYL BATTER, on behalf of themselves and all others similarly situated,
PASQUALE BILELLO and TABZCO INVESTMENTS INC.,

*Plaintiffs,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)
*(See inside cover for continuation of caption)*

## BRIEF AND SPECIAL APPENDIX FOR
## LEAD PLAINTIFFS-APPELLANTS

JEFFREY P. CAMPISI
KAPLAN FOX & KILSHEIMER LLP
800 Third Avenue, 38th Floor
New York, New York 10022
(212) 687-1980
jcampisi@kaplanfox.com

and

SAMUEL ISSACHAROFF
40 Washington Square South
New York, New York 10012
(212) 998-6580
si13@nyu.edu

*Attorneys for Lead Plaintiffs-Appellants*

APPELLATE INNOVATIONS
(914) 948-2240

22352

_____

– and –

ARUN BHATTACHARYA, individually and on behalf of all others similarly situated,

*Consolidated Plaintiff,*

– v. –

HECLA MINING COMPANY, PHILLIPS S. BAKER, JR., LINDSAY A. HALL,
LAWRENCE P. RADFORD and DEAN W.A. MCDONALD,

*Defendants-Appellees.*

_____

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiffs-Appellants Robert Gluck, Emma Gluck and Sarah Gluck ("Lead Plaintiffs") are individuals, and accordingly, no disclosure is required.

**<u>TABLE OF CONTENTS</u>**

**Page(s)**

TABLE OF AUTHORITIES ....................................................................... iv

CORPORATE DISCLOSURE STATEMENT ........................................ i

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED FOR REVIEW ....................................................2

INTRODUCTION ....................................................................................3

STATEMENT OF THE CASE ..................................................................6

I.     FACTUAL BACKGROUND...............................................................6

      A.    Defendants' Due Diligence of the Nevada Mines ...............6

           1.    Refractory Ore...........................................................7

           2.    Excess Water, and Lack of Permits and Infrastructure to Manage Water ...................................................8

           3.    Poor Ground Conditions Increased Costs....................9

      B.    Defendants' Deceptive Statements Concerning Hecla's Transformation through its Acquisition of the Nevada Mines ..........11

      C.    Hecla Closes its Acquisition of the Nevada Mines............................14

      D.    Defendants' Budget Meetings Confirmed that the Nevada Mines Were Dying ...............................................15

      E.    Defendants Begin to Slowly Disclose Negative, Adverse Conditions at the Nevada Mines .........................................19

      F.    Defendants Stanch the Bleeding of Cash by Shutting Down the Nevada Mines.......................................................20

II.      PROCEDURAL HISTORY AND RULING BELOW ................................21

SUMMARY OF ARGUMENT ...............................................................25

STANDARD OF REVIEW ..................................................................25

III.     ARGUMENT....................................................................................26

      A.     Plaintiffs Properly Pled the Elements of Securities Fraud.................26

              1.     March 19, 2018 Statements...............................................29

              2.     May 10, 2018 Statements..................................................30

              3.     July 23, 2018 Statements ..................................................32

              4.     Hecla's Corporate Updates ...............................................32

              5.     November 8, 2018 Statement.............................................33

              6.     December 4, 2018 Statement.............................................33

              7.     January 19, 2019 Statement ..............................................33

      B.     Material Omissions Are Not Protected by the PSLRA's Safe Harbor..................................................................................34

      C.     Defendants' Statements Lacked Meaningful Cautionary Language ..............................................................................35

      D.     Defendants' Representations Were Not Puffery or Corporate Optimism.............................................................................39

      E.     Defendants' Statements Describing the Nevada Mines as "High Grade" Were Materially False and Misleading....................44

CONCLUSION ...............................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ark. Teacher Ret. Sys. v. Bankrite, Inc.*,
   18 F. Supp. 3d 482 (S.D.N.Y. 2014) ....................................................41

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................26

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................26

*Caiola v. Citibank, NA., NY*,
   295 F.3d 312 (2d Cir. 2002) .............................................................44

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018) ..................................... 28, 35, 37

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
   639 Fed. Appx. 664 (2d Cir. 2016)........................................................2

*Gray v. Wesco Aircraft Holdings, Inc.*,
   454 F. Supp. 3d 366 (S.D.N.Y. 2020)
   *aff'd*, 847 F. App'x 35 (2d Cir. 2021)..................................................28

*Haw. Structural Ironworkers Pensions Tr. Fund v. AMC Ent. Holdings, Inc.*,
   422 F. Supp. 3d 821 (S.D.N.Y. 2019) ................................................37

*Ill. State Bd. of Inv. v. Authentidate Holding Corp.*,
   369 Fed. Appx. 260 (2d Cir. 2010).....................................................28

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017) ..................................................42

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006) ..................................................35

*In re: EZCorp, Inc. Sec. Litig.*,
   181 F. Supp. 3d 197 (S.D.N.Y. 2016) ................................................29

iv

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ..........................................................................29

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) ................................................................41

*In re Signet Jewelers Ltd. Sec. Litig.*,
   No. 16 Civ. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)............40

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022) ................................................................40

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ...................................................................... 28, 37

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
   620 F.3d 137 (2d Cir. 2010) ..............................................................................28

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
   14 F.4th 141 (2d Cir. 2021) ...................................................................... 25, 45

*Leadersel Innotech ESG v. Teladoc Health, Inc.*,
   No. 23-1112-cv, 2024 WL 4274362 (2d Cir. Sept. 24, 2024)............................27

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d. Cir. 2014) ..............................................................................37

*Miller v. Metro. Life Ins. Co.*,
   979 F.3d 118 (2d Cir. 2020) ..............................................................................25

*Noto v. 22nd Century Grp., Inc.*,
   35 F.4th 95 (2d Cir. 2022) ..................................................................................27

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ...................................................................... 30, 40

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F. Supp. 3d 55 (S.D.N.Y. 2018) ................................................................43

*P. Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004) ................................................................................28

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) ........................................................... 37, 43

*Rudani v. Ideanomics, Inc.,*
    No. 19 Civ. 6741 (GBD), 2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020) ..........34

*SEC v. Rio Tinto PLC,*
    No. 17-cv-7994 (AT), 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) .................41

*Sgalambo v. McKenzie,*
    739 F. Supp. 2d 453 (S.D.N.Y. 2010) .................................................29

*Slayton v. Am. Exp. Co.,*
    604 F.3d 758 (2d Cir. 2010) ........................................................... 37, 39

*U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.,*
    No. 12 Civ. 6811(CM)(JCF), 2013 WL 791462 (S.D.N.Y. Mar. 5, 2013) ..........41

**Statutes**

15 U.S.C. § 78aa ........................................................................1

15 U.S.C. § 78j(b) ......................................................................1

15 U.S.C. § 78t(a) ......................................................................1

15 U.S.C. § 78u-5 .......................................................................2

28 U.S.C. § 1291 ........................................................................2

28 U.S.C. § 1331 ........................................................................1

**Rules**

Fed. R. App. P. 4(a)(2) .................................................................2

Fed. R. App. P. 26.1 .................................................................... i

**Regulations**

17 C.F.R. § 240.10b-5 ...................................................................1

## JURISDICTIONAL STATEMENT

Lead Plaintiffs bring this action against Hecla Mining Company ("Hecla" or the "Company"), Phillips S. Baker, Jr. ("Baker"), the Company's former President and Chief Executive Officer ("CEO"), Lindsay A. Hall ("Hall"), the Company's former Vice President, Chief Financial Officer ("CFO") and Treasurer, Lawrence P. Radford, the Company's former Senior Vice President ("SVP") – Operations, and Dean W.A. McDonald, the Company's former SVP – Exploration ("McDonald") (collectively, the "Defendants") under: (1) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Section 10(b)"); and (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)").

The District Court had jurisdiction of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. On September 30, 2024, the District Court entered an Opinion and Order that granted Defendants' motion to dismiss "with prejudice" and that requested the Clerk of Court "close this case." SPA-21.[1] On October 23, 2024, Lead Plaintiffs submitted a proposed Judgment. CD-143. On October 28, 2024, Lead Plaintiffs filed a Notice of Appeal in the District Court. JA-

---

[1] This brief designates Special Appendix materials as "SPA-__" and Joint Appendix materials as "JA-__." Entries on the civil docket in Case No. 1:19-cv-04883-ALC are designated as "CD __." In addition, all emphasis is added, and internal citations omitted, unless otherwise noted.

1814-15. On November 27, 2024, the District Court entered the Judgment. SPA-22.

The Second Circuit has held that "a premature notice of appeal from a nonfinal order may ripen into a valid notice of appeal if a final judgment has been entered by the time the appeal is heard and the appellee suffers no prejudice." *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 Fed. Appx. 664, 666 (2d Cir. 2016) (summary order) (quoting Fed. R. App. P. 4(a)(2) ("A notice of appeal filed after the court announces a decision or order – but before the entry of the judgment or order – is treated as filed on the date of and after the entry.")). Because final judgment has been entered and there is no prejudice to Defendants, this Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.  In March 2018, Defendant Hecla disclosed its acquisition of several gold mines in Nevada (the "Nevada Mines") from Klondex Mines, Ltd. ("Klondex"). The first issue presented for review is whether the District Court erroneously found that Defendants' representations about historical and present conditions at the Nevada Mines were forward-looking statements that were shielded from liability under the safe harbor provision of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-5 ("PSLRA").

2.  Defendants made representations about Hecla's abilities to improve operations and exploration at the Nevada Mines, but failed to disclose known

material negative conditions that hampered and would continue to hamper operations and exploration. The second issue presented for review is whether the District Court erred in finding Defendants' representations were inactionable expressions of corporate optimism and puffery.

## **INTRODUCTION**

The securities laws necessarily leave a wide berth for companies to take risks whose future prospects are uncertain. At the same time, these laws require investor protection against misrepresentation of critical information that can be known only to management. All businesses are prone to some degree of puffery that markets may readily discount, and they all may express future optimism. What they cannot do is lie about facts that are known and meaningful to deceive the markets.

This is a case alleging willful misrepresentations about present facts, known only to the Defendants, about the state of the Nevada Mines, a major gold mining operation that Defendant Hecla acquired in March 2018. The crux of the case is that Defendants falsely assured investors throughout the Class Period (March 19, 2018 through May 8, 2019) that the Nevada Mines were a boon to Hecla "from the get-go," that they were "cash flow positive," that they were from the time of acquisition "self-funding," and that they were operating as "high-grade gold mines." However, in truth, according to numerous confidential informants ("CIs") and Defendants' own admissions after the Class Period, the Company acquired a desperately troubled

3

asset that was plagued from the outset by material, negative conditions.

From the beginning, according to the Complaint[2] and the supporting information from the CIs, the mines were not and had no prospect of being cash flow positive, were not self-funding, and the high-grade ore was rendered inaccessible by terrible mining conditions, most notably a high water table that frustrated operations. According to the Complaint and the CIs, this information was known to Defendants and rendered their positive statements about the Nevada Mines false when stated and throughout the Class Period. When the truth about the Nevada Mines began to be disclosed, Hecla's stock price crashed.

In fact, multiple CIs confirm that by the start of the Class Period the Nevada Mines were in terminal decline. Unknown to investors, the Nevada Mines contained economically unviable gold reserves in ultrafine dispersed mineral formations (termed "refractory gold ore"), and did not have the necessary water discharge permits and infrastructure to handle excess water. As a result, gold production had declined during the Class Period and was expected to continue declining. These and other material negative conditions hampered production and drained cash flows and would continue to do so. Defendants' positive statements that they could improve the Nevada Mines and operate them on at least a cash flow neutral basis stood in

---

[2] "Complaint" refers to the Second Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws. JA-902-93 (CD-124).

stark contrast to the undisclosed negative conditions. In truth, as one corporate representative (Defendant Baker) admitted after the Class Period, the acquisition of the Nevada Mines was an attempt "to take this plane that was flying and redesign it and rebuild it in the air, and it was just costing us way too much money." Indeed, by the start of the Class Period, the Complaint clearly sets out the challenges that Defendants knew to be thwarting production. Defendants failed to disclose critical material facts, including excess water, uneconomic refractory ore, lack of essential infrastructure and equipment, and loss of reserves.

The District Court erred in finding that "many" of Defendants' alleged misstatements were protected by the PSLRA safe harbor for uncertain future predictions. The District Court's analysis cannot be reconciled with the Company's repeated invocation of false current fact, including for example, "[t]hese assets immediately add production and cash flow." Nor is it a matter of "puffery" to state that the mines contained "high-grade gold" and were producing "robust cash flows," when the reality was that cash flows were never positive and that the gold ore while "relatively high grade," could not be profitably exploited because the costs "are too high."

Misrepresentations of currently known information are neither forward-looking nor puffery. They are materially false or misleading. The District Court's holding to the contrary should be reversed.

5

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

#### A.    Defendants' Due Diligence of the Nevada Mines

In or around November 2017, Defendants began technical due diligence of the Nevada Mines (comprised of the Fire Creek, Hollister and Midas gold mines) regarding the Company's potential acquisition of Klondex. JA-928-29 ¶ 49. Defendants were granted access to the Nevada Mines and key people, which provided what CEO Baker described as "significant insights into the properties, particularly Fire Creek." JA-908-09, 928-29 ¶¶ 8, 49, 53.[3] Fire Creek, which started production in 2014, was the "cornerstone" asset due to its reportedly robust positive cash flows, low cash costs and "high-grade gold." JA-908, 929, 944-46 ¶¶ 7, 52, 96, 99. Hollister was important for the prospective development and mining of the Hatter Graben, a large system of veins that Hecla said could be reached from Hollister. JA-908 ¶ 7. Midas was an older mine that had been in production for decades but was still purportedly providing production and cash flow. *Id*. Materials mined at Fire Creek and Hollister were processed at the Midas mine. *Id*.

Defendants' due diligence revealed that gold production and cash flows were

---

[3] In May 2024, Defendant Baker resigned from his positions as President and CEO, and as a member of Hecla's board of directors. *See* https://ir.hecla.com/News--Media/news-releases/news-details/2024/Hecla-Announces-Leadership-Transition/default.aspx (last visited Dec. 18, 2024).

declining and that the Nevada Mines were in a state of disrepair that required substantial capital and operational expenditures, conditions that were then negatively affecting operations and production, and that would wipe out all positive cash flow from the Nevada Mines. JA-910-17, 919-20, 930-40, 971, 982-83 ¶¶ 13, 17, 55-58, 65-83, 173, 196-97.

### 1. Refractory Ore

Historically, the Nevada Mines produced gold ore that could be processed at the Nevada Mines employing standard gold extraction processes. JA-974-75, 980 ¶¶ 177, 190. During due diligence, CI 13 (general manager of the Nevada Mines) and CI 14 (geologist at the Nevada Mines) informed Defendants Radford and McDonald that Fire Creek contained refractory gold, which is ultrafine dispersal of gold in other mined materials that makes recovery of the gold extremely difficult and expensive. JA-909, 911, 916 ¶¶ 9-10, 13(a)(i), (iv), (b)(ii). While refractory ore may be high-grade, the costs to extract that gold are astronomical and substantially higher than extraction of gold from non-refractory ore: capital costs are higher, with facilities costing over $1 billion, and operational costs are higher. JA-909 ¶ 11. According to multiple CIs, the Nevada Mines did not have the equipment or facilities to process refractory gold, and Defendants' plan to turn around the Nevada Mines relied upon outsourcing the work at exorbitant rates, which would further drain cash flow. JA-909-10, 916, 932-33, 937, 976-77, 983-84 ¶¶ 10-12, 13(a)(iv), 13(b)(iv), 66, 78, 185,

199.

Relatedly, production of gold at the Nevada Mines was declining and projected to further decline. JA-909-17 ¶¶ 9, 13. According to CI 13, at the time of due diligence, production of gold at Fire Creek was in decline and cash flows were rapidly declining due to poor ore characteristics and increased costs of production. JA-910-13 ¶ 13(a). While Klondex produced over 160,000 ounces of gold in 2017, Hecla executives, including Defendant Radford, were informed that due to the ore characteristics at Fire Creek, gold production would drop to the mid-80,000 ounces range in 2018. JA-912-13 ¶ 13(a)(viii). According to CI 13, it was obvious that the Nevada Mines were running out of gold to drill. *Id.* Lower production directly decreased revenue, while operational costs to address these issues remained high, contributing to negative cash flow. JA-910-17 ¶ 13. Furthermore, in late 2017, Klondex ceased to conduct exploratory drilling, a fundamental process necessary to identify gold prospects to be excavated in the following one to two years. JA-937, 939 ¶¶ 77, 83. In other words, information known at the time of acquisition established that current production was falling and there were diminished prospects for any future new sources of production.

### 2.    Excess Water, and Lack of Permits and Infrastructure to Manage Water

According to multiple CIs, excess water at Fire Creek was a chronic problem that was known to Defendants before and during the Class Period. JA-930-33, 934-

36, 937-39, 941-42 ¶¶ 58, 65, 68, 70, 74, 77, 79, 80-82, 89. Water management is a permanent feature of mining and defines the capacity for production. The Nevada Mines lacked permits to handle wastewater discharge and were plagued with decrepit water management infrastructure and equipment, which hindered production and required massive capital and spending to improve operations. JA-930-31, 933-34, 937-39 ¶¶ 58, 68, 77, 80-81. For example, rapid infiltration basins (RIBs) at Fire Creek, which are key to the water management infrastructure, were defective and failed to handle water discharge, and persistent water buildup at Fire Creek required trucking water to Midas, which significantly increased operating expenses. JA-912, 930-31 ¶¶ 13(a)(vi), 58. The Nevada Mines' use of ad hoc measures to circumvent essential capital investment constrained production and increased costs. JA-934, 936 ¶¶ 69, 74. According to CIs 8-10, the excess water at Fire Creek exceeded the 100 gallon-per-minute permit limit and the pumps needed to remove excess water were defective and inefficient. JA-936-37 ¶¶ 74, 76-77.

### 3.    Poor Ground Conditions Increased Costs

Finally, before and during the Class Period, production of gold at Fire Creek was in decline and cash flows were rapidly declining due to poor ore characteristics and ground conditions, which increased costs of production. JA-910-11, 930, 933-36 ¶¶ 13(a), 57, 65, 68, 70-72, 75. Fire Creek ore contained high clay content, while Midas and Hollister ore had high carbon content, requiring extra processing and

chemical treatments, according to multiple CIs. JA-911, 932-36 ¶¶ 13(a)(iii), 65, 68, 70-71, 75. Clay-rich ore needed multiple processing cycles, raising operational expenses. JA-911, 913-14, 932-36, 941, 960, 965 ¶¶ 13(a)(iii), (xii), 65, 68, 70, 71, 75, 87, 137, 154. Carbon-rich ore required expensive chemical treatments, such as additional processing using hypochlorite, further increasing costs. JA-932, 934-37, 940-41 ¶¶ 65, 70, 72, 76, 86. Furthermore, high sediment content strained water pumps and other processing infrastructure, leading to frequent breakdowns, costly replacements and excess water. JA-932, 934, 936-37 ¶¶ 65, 70, 74, 76. Increased maintenance and replacement costs for processing equipment further reduced cash flow. *Id*.

Furthermore, the Nevada Mines relied on costly external contractors, such as American Mining & Tunneling, due to an inadequate workforce. JA-912 ¶ 13(a)(v). High contractor fees and inefficient equipment increased operational costs and further reduced profitability. JA-911-12, 934-35 ¶¶ 13(a)(iv)-(vi), 70.

These negative conditions, as corroborated by multiple CIs, eroded cash flow, impeded production, and as admitted by Defendant Baker at the end of the Class Period, were known to Defendants at the start of the Class Period: "when doing the due diligence, [in November 2017 through March 2018] we recognized certain problems with Fire Creek dealing with the tuff material, managing the water, equipment availability, getting enough development to have consistent production,

lack of characterization of ore types." JA-919, 971-72 ¶¶ 17, 173. Also at the end of the Class Period, Defendants further revealed constraints due to water permit limits, uneconomic refractory ore, defective infrastructure to manage water, and costly contractors, which collectively increased costs and hampered production. JA-971-75 ¶¶ 173-77. During the Class Period, Defendants failed to disclose these known facts and made contrary public representations, as established by what follows.

**B.    Defendants' Deceptive Statements Concerning Hecla's Transformation through its Acquisition of the Nevada Mines**

The Class Period begins on March 19, 2018, when Defendants announced the acquisition of the Nevada Mines. JA-944-45 ¶ 96. Defendants did not reveal any of the known problems with the Nevada Mines' operations at that time. To the contrary, Defendants' March 19, 2018 press release represented the following based on Defendants' due diligence and their understanding of present conditions at the Nevada Mines:

> Hecla to Acquire ***Three High-Grade Gold Mines*** with the Acquisition of Klondex Mines Ltd.
>
> These land packages . . . ***have the highest grade mines in the U.S. . . .***
>
> ***We can improve costs, grow reserves and expand production*** . . . shareholders can benefit from the ***162,000 gold equivalent ounces a year of production***
>
> After extensive due diligence, ***we see significant opportunity to improve costs, throughput and recoveries*** over time with our expertise . . . We expect this transaction

11

to be accretive on many important financial and credit metrics, with potentially significant synergies. . .

A Further Transformation of Hecla . . . Well capitalized pro - forma company with strong cash flow and solid balance sheet – Hecla expects to improve financial metrics with the Nevada mines' cash flow. . .

Benefits to Hecla Shareholders . . . ***Fire Creek is a cornerstone producing asset with robust cash flows and significant opportunities for exploration, mine life expansion, and increased throughput***.

*Id.* (emphasis in original).

These are all statements of present fact that Defendants made, despite their knowledge to the contrary. Also on March 19, 2018, during a conference call with investors and analysts, Defendant Baker represented that Klondex had done "a good job of running" the Nevada Mines, that Klondex management did a "really good job of understanding the geology," that it "was clear" that there was "excess value," and that the Nevada Mines would require a "small amount of capital." JA-929-30, 945 ¶¶ 54, 97. In response to an analyst question concerning ongoing maintenance capital expenditures for the Nevada Mines, Defendant Baker represented that factoring in exploration and development costs at the Nevada Mines, and based on Defendants' extensive due diligence, the operations were and would continue to be cash flow positive at that time:

[B]ut ***all of this stuff is relatively small capital***. That was one of the things that struck us is we can acquire this. Nevada itself will be cash flow positive for us. ***There is no***

12

> *capital outlay that we're looking to, in Nevada, that's going to consume all of the cash flow that will be generated from the three mines* . . .

***

> "We would anticipate seeing that higher grade. But even if it's not, *what we find with our mine plans is that we will, basically the downside is we get all of our money back*. So we don't have a view that we're relying upon a big increase in the grade to have this thing be economic for us."

***

> *And then from the get-go, the Nevada assets are going to be cash flow positive.* So we don't see any sort of financial stress as a result of the transaction . . . we put to good use the cash that we have on our balance sheet. It's sitting there and hasn't – it doesn't generate any returns for us and instead *we're now acquiring 160,000 plus of production, and immediate cash flow*.

JA-945-46 ¶ 99 (emphasis in original).

On May 10, 2018, on a conference call with investors and analysts, Defendant Baker represented, concerning the Nevada Mines that: "[w]e saw three large, in this case, Nevada properties as big as those that we already have, and we saw extraordinary grades." JA-947 ¶ 103. On the conference call, Defendant McDonald stated:

> I'm very excited about the exploration opportunities in northern Nevada once the acquisition of Klondex is concluded . . . [I]t is rare that you can acquire 110 square miles of exploration ground in northern Nevada that lies within or at the intersection of prolific trends or rifts. They have a great team of geologists, with a significant

13

> understanding of the properties, and we look forward to working together to realize the potential of this ground.

JA-948 ¶ 105.

Also on May 10, 2018, Hecla filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2018 that contained generic warnings of potential risks to Hecla as a result of acquisitions that "could" or "may" adversely impact Hecla, without a mention of the known negative conditions that had already materialized at the Nevada Mines and were negatively impacting production and cash flow at that time. JA-949-51 ¶¶ 109-10. Defendants repeated these boilerplate warnings, unchanged, throughout 2018. JA-958, 962 ¶¶ 128, 141.

### C.     Hecla Closes its Acquisition of the Nevada Mines

On July 23, 2018, Defendant Baker stated: "'With this acquisition, *Hecla now has three high-grade mines* in Nevada . . . *These assets immediately add production and cash flow,* and because they are a good fit with Hecla's expertise, we believe there is significant opportunity for improvement in the mines' productivity and consistency.'" JA-953 ¶ 115 (emphasis in original). According to CIs, including CIs 13 and 14, in July 2018, Defendants and other senior Hecla executives participated in meetings and were directly informed of the undisclosed material negative conditions that Defendants Radford and McDonald were warned of, or at least recklessly ignored, during due diligence—uneconomic refractory ore, massive capital needs, lack of necessary water discharge permits and lack of infrastructure to

handle the water. JA-916-17, 913-14 ¶ 13(b)(v) (permit limits created bottleneck and difficulties discharging water), ¶ 13(a)(xii) (July 2018 meeting where Defendant Radford was informed that costs of production were increasing and gold production was declining); ¶ 13(b)(iv) (uneconomic refractory gold ore); ¶ 13(a)(xiii) (runaway costs to discharge water). CIs 13 and 14's information is corroborated by CIs 9 and 10. JA-940-41 ¶¶ 86-87. According to CI 14, in response to learning about the negative conditions at the Nevada Mines and that Hecla paid a steep price to acquire them, rather than coming clean to investors, Defendants covered up the problems in an effort to portray the acquisition as a good investment for shareholders. JA-917 ¶ 13(b)(vi).

On August 9, 2018, Defendant Baker reiterated that the "high-grade Nevada Mines" "*will be self-funding. We're not anticipating needing to contribute additional capital into it*." JA-954-56 ¶¶ 118, 121 (emphasis in original). Defendants Baker and Hall represented on the same date: "*The Nevada assets are basically self-funding*" and that Defendants were "*not anticipating needing to contribute additional capital into it*." JA-954-56 ¶¶ 118, 120-21 (emphasis in original).

## D. Defendants' Budget Meetings Confirmed that the Nevada Mines Were Dying

In or around September 2018, CI 14 attended a budget meeting (at Hecla's office in Coeur d'Alene, Idaho) where the Fire Creek managers proposed new spending for the 2019 drill programs. JA-917 ¶ 13(b)(vii). According to CI 14,

15

Defendant Baker was at the meeting and was concerned about the proposed spending on projects and he was shocked by the proposed amount and that it was required to be invested so soon to extend the life of mine. JA-917, 958 ¶¶ 13(b)(vii), 131. According to CI 14, the life of mine, which provides an estimate of the amount of inferred and proven reserves left to mine, in reality, was closer to three years, or 40% lower than the five years Defendants represented to investors starting in October 2018. *Id.* This information was not publicly disclosed during the Class Period.

CI 14's first-hand account is consistent with information provided by CI 13, who in late 2018 presented budgets for the Nevada Mines to Hecla senior management, including Defendants Baker, Radford, Hall and McDonald, that showed cash flow at Fire Creek had extremely diminished year-over-year. JA-915 ¶ 13(a)(xv). CI 13's presentations showed that fewer ounces were being produced year-over-year at the Nevada Mines, that the veins at Fire Creek were dying, and that the Nevada Mines were running out of areas to drill. JA-912-13, 915 ¶¶ 13(a)(viii), (xv)-(xvi). As to the loss of reserves, CI 13 identified specific events that corroborate CI 14's account. According to CI 13, in or around September-December 2018, after mining an area of the Fire Creek that was expected to contain substantial gold ore, only 20% of the expected production was found, representing a loss of approximately 20,000 ounces of expected gold or approximately $24 million in lost cash flows. JA-914 ¶ 13(a)(xiv).

Also, during the fall of 2018, Hecla began to further explore the Joyce and Vonnie veins at Fire Creek. JA-942 ¶ 90. According to CI 10, although these veins were represented by Defendants as high-grade, upon commencement of mining the top two layers, staffers concluded the high-grade ore was not there, meaning these veins would not produce profitable material. *Id.* Furthermore, when Hecla started to mine, the ground conditions quickly turned poor, and Hecla had a great deal of difficulty mining these areas. *Id.* In fact, at Vonnie, mining was cut short because the ground conditions were very poor, and the vein started to lean over and was too shallow to be mined safely. *Id.*

None of this information was publicly disclosed. To the contrary, on October 3, 2018, Hecla disseminated to investors a "Corporate Update" that represented "Fire Creek Vein Networks Offer Extensive Opportunities . . . ***Current reserves and resources provide mining inventory out to 2023***" (five years) and that Hecla "[r]ecently acquired ***high grade gold mines in Nevada***." JA-958 ¶ 130 (emphasis in original). In November and December 2018, and January 2019, Defendants repeated these representations. JA-962-64 ¶¶ 143, 147, 150.

By November 2018, the Nevada Mines were cash flow negative, a trend that CI 13 informed Defendants Radford and McDonald would continue into 2019, thereby confirming CI 8's recollection of that information being available but not disclosed. JA-915, 941-42 ¶ 13(a)(xv); *see also* ¶ 89 (alleging CI 8 attended meeting

17

with Radford where negative cash flow discussed). According to CIs 8, 13 and 14, Defendants Baker, Hall and Radford had already learned at meetings that gold production at Fire Creek was in terminal decline and cash flows had rapidly declined and were trending negative for 2019 due to refractory gold, a permit cap on water discharge, and increased cost of production. JA-910-12, 915, 917, 941-42 ¶¶ 13(a)(i-iv), (vii), (xv), (b)(vii), 89.

Not only was this information not publicly disclosed, but on November 8, 2018, Defendant Baker stated to the contrary: the Nevada Mines "'***are going to generate the cash flow necessary for it to do the ramp up of development in 2019***' and that 'we're not anticipating the need to make significant contributions into Nevada . . . *we see Nevada being able . . . to pay for the development with Fire Creek . . . we think we can run it pretty close to cash flow neutral*.'" JA 959-60 ¶ 135 (emphasis in original). On that same date, Defendant Radford stated: "***[O]ur goal for Nevada operations is that the operations are cash-neutral, including*** Hatter Graben development and ***the Fire Creek development ramp-up*** . . ." JA-960 ¶ 137 (emphasis in original). Also on November 8, 2018, Defendants stated that the development "of select high-grade zones" was delayed until 2019, but made no mention that the delay was the direct result of known, negative conditions—excess water and the absence of high-grade ore. JA-959 ¶¶ 133-34.

On December 4, 2018, the Company held a conference call during which

18

Defendant Hall represented that: "***There's no major capital expenditures that we can't fund out of the Nevada operations.*** So we're really quite pleased with the transaction." JA-963 ¶ 145 (emphasis in original).

### E. Defendants Begin to Slowly Disclose Negative, Adverse Conditions at the Nevada Mines

On February 21, 2019, when disclosing Hecla's financial results for 2018, Defendants for the first time publicly admitted that in 2018 the Nevada Mines were cash flow negative and not self-funding. Only then did Defendants disclose gold reserve losses and that gold production had declined approximately 80%, from approximately 162,000 ounces in 2017 to 32,887 ounces in 2018. This acknowledgment caused Hecla stock to decline approximately 7%. JA-922, 964-65 ¶¶ 23, 153, 155 (Defendant Baker: "we have a goal of financial discipline in which each of our mines should produce free cash flow and that clearly didn't happen with our Nevada operations").

On April 18, 2019, Hecla issued a press release that stated "[a] minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate." JA-969 ¶ 169. This statement for the first time, and only partially, disclosed that Defendants needed to amend the water discharge permits at Fire Creek. This announcement caused Hecla stock to decline approximately 6% more. JA-969-70 ¶ 171.

**F.     Defendants Stanch the Bleeding of Cash by Shutting Down the Nevada Mines**

On May 9, 2019, after the end of the Class Period, Defendants shocked investors when they disclosed that the Nevada Mines were "under review" because of increased costs, negative cash flow, and a loss of over $18 million. JA-970-72, 976 ¶¶ 172-74, 181. Defendants identified the "challenges in Nevada": 1) high costs due to the expensive and unavoidable contracts with its contractor, 2) uneconomic refractory gold ore and no way "to process it," 3) increased water that slowed the rate of production and "inadequate infrastructure to deal" with excess water, and the need to expand permitted water discharge limits, 4) further declines in gold production and lower revenue, and 5) that the mine life declined to 1.5 years, from 5 years—all of which according to CIs 13 and 14 and other CIs, Defendants had known before and during the Class Period. JA-971-75 ¶¶ 173-74, 176-77. These disclosures caused Hecla's stock to further decline by over 13%. JA-975 ¶ 178.

Then, on June 6, 2019, Defendants effectively shut down operations at the Nevada Mines because of these conditions. Contrary to the public statements throughout the Class Period, the Nevada Mines were indeed cash flow negative, as the Defendants knew but did not disclose. To this day, operations have not resumed. JA-925, 976-79 ¶¶ 35, 185, 187. Notably, Defendants Baker and Radford admitted that Defendants encountered refractory ore that while "high-grade" was "too high" in cost to develop, that Fire Creek had "very little reserves," that the Nevada Mines

20

needed to increase the permit limits to discharge water by 150%, that Defendants were seeking a third-party to lower the cost to process refractory gold ore, and that Defendants been forced to cut capital expenses by $25 million to operate at close to cash flow neutral. JA-977-80 ¶¶ 187-88. Analysts reacted harshly to Defendants' disclosures, calling the changes "desperate" and a "complete reversal" since the acquisition. JA-976, 980 ¶¶ 181, 189.

On August 7, 2019, on a conference call with investors and analysts, Defendant Baker admitted that the Nevada Mines had been hemorrhaging cash since Hecla acquired the properties: "So in this third quarter, **for the first time since the acquisition of Klondex a year ago, our plans show us generating more cash than we spend** . . ." JA-982-83 ¶ 196 (emphasis added). Similarly, on August 8, 2019, Defendants admitted in Hecla's quarterly report for the quarter ended June 30, 2019 that stated "**total production and capital costs have exceeded sales at our Nevada operations since the acquisition** . . ." JA-983 ¶ 197. Needless to add, since costs had exceeded revenues "since the acquisition," the Nevada Mines could never have been cash flow positive or neutral.

## II.   PROCEDURAL HISTORY AND RULING BELOW

This action commenced on May 24, 2019. (CD-1). On March 25, 2020, the District Court appointed Robert Gluck, Emma Gluck and Sarah Gluck as Lead Plaintiffs. (CD-80). On September 9, 2020, Lead Plaintiffs filed a consolidated

complaint that alleged particular facts based on information provided by 12 CIs. (CD 86). On December 9, 2020, Defendants moved to dismiss the consolidated complaint. (CD 94-96). On February 22, 2023, the District Court entered an Opinion and Order granting Defendants' motion to dismiss with leave to amend. JA-875-901 (the "February Order").

The February Order found that "Plaintiffs have not articulated sufficient factual allegations to carry their assertions beyond the speculative level: many of Defendants' alleged misstatements are protected by the PSLRA safe harbor . . . " JA-886 (February Order at 12).

While the February Order found that two alleged misrepresentations were not forward-looking—"'With this acquisition, Hecla now has three high-grade mines in Nevada . . . These assets immediately add production and cash flow'" and "'There's no major capital expenditures that we can't fund out of the Nevada operations. So we're really quite pleased with the transaction'"—the District Court found that the consolidated complaint did not assert "sufficient facts to indicate a strong inference of scienter" and "failed to plead sufficient facts demonstrating Defendants' statements were false when made." JA-891-900 (February Order at 17-26). The District Court explained:

> The defect in Plaintiffs' recklessness scienter theory lies in their failure to plead the falsity of Defendants' alleged misstatements. As to the assertions made by Plaintiffs' CIs, Plaintiffs have not adequately alleged why and how

22

> the knowledge of the CIs can be imputed to the knowledge of the Defendants. Most of these CIs were low level employees—miners, surveyors and machine operators—and Plaintiffs have provided no basis for the Court to infer that the balance of the information known by these CIs was also known or communicated to the Individual Defendants—all senior executives at Hecla . . .
>
> As discussed above, the chief defect in the Amended Complaint is Plaintiffs' failure to plead that Defendants' statements were false at the time they were made . . . In short, Plaintiffs do not explain what "specific contradictory information was available to [Defendants] *at the same time* they made their [allegedly] misleading statements.

JA-895-98 (February Order at 21-24).

On April 4, 2023, Plaintiffs filed the current Complaint that is the basis for this appeal. JA-902-93 (CD-124). The Complaint realleged Defendants' misrepresentations that the District Court dismissed and added several misrepresentations. To address the pleading deficiencies identified by the District Court in the February Order, the Complaint added allegations based on additional information from the 12 original CIs and additional facts showing why Defendants' statements were misleading when made. JA-932-43 ¶¶ 65-94; JA-1589-686 (copy of Complaint highlighting amendments to the consolidated complaint). Moreover, the Complaint alleged specific facts based on two additional CIs (CIs 13 and 14) who possessed first-hand knowledge and who had direct contact with Defendants Radford and McDonald before and during the Class Period. JA-909-17 ¶¶ 9-13. The

particular allegations based on CIs 13 and 14 show that Defendants knew the Nevada Mines were a troubled asset from the outset.

On May 12, 2023, Defendants moved to dismiss the Complaint, arguing that neither actionable misrepresentations nor scienter were adequately alleged. (CD-130). Plaintiffs opposed the motion on June 21, 2023 and Defendants replied on July 21, 2023. (CD 133, 137).

On September 30, 2024, the District Court entered an Opinion and Order (the "Order") granting Defendants' motion to dismiss the Complaint. SPA-1-21. While the Complaint realleged Defendants' misrepresentations that the District Court dismissed in the February Order, the Order dismissing the Complaint focused solely on eight newly alleged misrepresentations. SPA-13-21.[4] In the Order, the District Court found that the Complaint did not allege any actionable misrepresentations, and therefore, did not reach the issue of scienter. *Id*. The District Court held that most of

---

[4] While the Complaint added more specific allegations to the misrepresentations that the District Court previously dismissed in the February Order, the Order did not analyze the realleged misrepresentations. Because the District Court did not reassess the additional information buttressing the original consolidated complaint, Lead Plaintiffs do not separately address the realleged misstatements that were ignored by the Order. Moreover, the addition of the specific allegations of CIs 13 and 14 closed the scienter deficit identified by the February Order. JA-893-96 (finding consolidated complaint failed to allege "why and how the knowledge of CIs can be imputed to the knowledge of the Defendants."). However, nothing in the Order addresses this point. SPA-20 ("[T]he Court need not reach the question whether Plaintiffs have adequately pleaded scienter.").

the challenged statements were forward-looking and thus protected under PSLRA's safe harbor provision, and that those statements that were not forward looking could be dismissed as expressions of puffery and corporate optimism. *Id*. This appeal followed.

## SUMMARY OF ARGUMENT

The District Court's finding that many statements made by Defendants were forward-looking projections that fell within the PSLRA's safe harbor was erroneous because Defendants made representations of present or historical facts, not projections. The District Court further erred in finding that Defendants' other statements were mere corporate puffery, ignoring key facts and context that illustrate that Defendants failed to disclose known material negative conditions and risks at the Nevada Mines, which undermined the accuracy of their positive representations about the Nevada Mines' economic viability, and misled investors.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6), "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021) (quoting *Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 121 (2d Cir. 2020)).

25

## III. ARGUMENT

### A. Plaintiffs Properly Pled the Elements of Securities Fraud.

It is important to emphasize what this case is not. Unlike most dismissal opinions in the aftermath of *Twombly* and *Iqbal*,[5] the District Court did not rest its holding on findings that the claims in the operative Complaint were implausible or that they failed to allege scienter with sufficient specificity. Instead, the holding below turned on the legal conclusion that all but one of the alleged misrepresentations concerning the economic benefits of the Nevada Mines acquisition are protected statutorily as forward-looking projections. SPA-12-17. The one remaining alleged misrepresentation concerning whether the mines were "high grade" is dismissed as mere corporate puffery or for being "neither false nor misleading." SPA-18-20. Only after dismissing all the claimed misrepresentations as falling within a statutory free fire zone did the District Court state that "[b]ecause Plaintiffs have failed to plead any actionable misstatement or omission, the Court need not reach the question of whether Plaintiffs have adequately pleaded scienter." SPA-20.[6]

---

[5] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[6] The District Court then added, incongruously, that "the Court finds that the Amended Complaint does not set forth sufficient facts alleging scienter, and thus Plaintiffs fail to state a claim as a matter of law as to all of Defendants' alleged misstatements." SPA-20. There is no reason or explanation given, nor even a hint of

As set out above, the District Court's Order focused exclusively on eight statements that were added to the Complaint and made no finding whether the new context provided sufficient support for the original allegations. In fact, the District Court did not address this issue at all, meaning that a portion of the record has not even been addressed by the District Court in the first instance.

With regard to the eight new alleged misrepresentations supported by two new CIs well placed in contact with Hecla's senior management, the District Court did not address either the reliability of these CIs or whether their allegations were sufficient to infer scienter at the pleading stage.

Instead, the District Court's Order found as a matter of law that seven statements were forward-looking because they fell "'squarely within the definition of 'a statement containing a projection of … income (including income loss), earnings (including earnings loss) per share, … or other financial items' and 'a

---

the basis for this "finding" and this Court should decline to consider scienter arguments in the first instance. *See Leadersel Innotech ESG v. Teladoc Health, Inc.*, No. 23-1112-cv, 2024 WL 4274362, at *5 (2d Cir. Sept. 24, 2024) ("Although Teladoc argues in the alternative that all of the claims should be dismissed because the SAC failed to adequately plead scienter and loss causation, the district court did not consider those arguments, and we decline to do so here in the first instance."); *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022) ("Defendants argue that plaintiffs' § 10(b) material misrepresentation claims also should be dismissed for the additional reasons that the complaint fails to adequately plead scienter and loss causation. But the district court declined to consider those arguments . . . 'It is this Court's usual practice to allow the district court to address arguments in the first instance.' . . . Accordingly, we do not address them here.") (citations omitted).

statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management.'" SPA-15 (citing *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 386 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021)). This is a straightforward error of law. As discussed below, the District Court erred because Defendants made representations of past or present facts, which are not protected by the PSLRA's safe harbor. Nothing in the PSLRA gives parties the right to misrepresent current facts and knowledge.

The PSLRA's safe harbor applies "only to forward-looking statements." *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 Fed. Appx. 260, 264 (2d Cir. 2010) (summary order); *see P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004). ("[T]he misrepresentation of present or historical facts cannot be cured by cautionary language.").

This Court in *In re Vivendi, S.A. Securities Litigation* held that "'[a] statement may contain some elements that look forward and others that do not,' and 'forward-looking elements' may be 'severable' from 'non-forward-looking' elements." 838 F.3d 223, 246 (2d Cir. 2016) (citing *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010)); *see also Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) ("[M]any of the Individual Defendants' statements are not protected by the safe harbor provision because they were

statements of present fact.”); *In re: EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 207–08 (S.D.N.Y. 2016) (finding statements of regulatory compliance not forward-looking and thus actionable because the statements were “of present fact relative to the irresponsible lending guidelines”); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) (finding safe harbor provision does not apply and alleged misstatements are not forward-looking because they state present or historical facts); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (finding PSLRA safe harbor does not apply to “defendants’ failure to disclose historical and existing material facts about [defendant’s] computer problems and the impact of those problems on the reliability of the financial statements”).

Each of the following set of precise factual allegations is legally actionable and not protected by any statutory safe harbor:

### 1. March 19, 2018 Statements

On March 19, 2018, based on Defendants’ four months of due diligence on the Nevada Mines, Defendant Baker stated: “***We can improve costs, grow reserves and expand production*** . . . shareholders can benefit from the ***162,000 gold equivalent ounces a year of production***.” JA-944 ¶ 96 (emphasis in original). This statement is not forward-looking because Defendant Baker makes a representation about Hecla’s current capabilities to improve operations and production based on what Defendants had learned during due diligence. Moreover, Defendant Baker’s

present-tense representation that shareholders can benefit from annual production of over 160,000 gold ounces asserted current facts about production, when Defendants knew the annual output had declined and would drop to the mid-80,000 ounces range in 2018. JA-912-13 ¶ 13(a)(viii).

Furthermore, Defendant Baker made this statement while he knew, or recklessly ignored, contrary facts: the Nevada Mines would not produce 162,000 ounces of gold per year, costs were unavoidable and increasing, gold production had decreased and was expected to continue declining, and the Nevada Mines did not have the necessary water permits and infrastructure to support expanded production. JA-910-13 ¶¶ 13(a)(i)-(iv), (vii)-(viii). *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements were false and misleading where "defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true."). Because the statement makes representations concerning Defendants' present ability to improve operations, while they knew of negative conditions that then were and would continue to negatively impact Defendants' ability to improve operations at the Nevada Mines, they are not protected by the PSLRA's safe harbor.

### 2. May 10, 2018 Statements

On May 10, 2018, on a conference call with investors and analysts, Defendant Baker represented, concerning the Nevada Mines, that: "[w]e saw three large, in this

case, Nevada properties as big as those that we already have, and ***we saw***
***extraordinary grades***." JA-947 ¶ 103 (emphasis in original). Baker attributes his
representation about the quality of the ore grade based on what he saw—in the past
tense. This is not forward looking.

Also on May 10, 2018 during the conference call, Defendant McDonald
stated:

> I'm very excited about the exploration opportunities in
> northern Nevada once the acquisition of Klondex is
> concluded . . . [I]t is rare that you can acquire 110 square
> miles of exploration ground in northern Nevada that lies
> within or at the intersection of ***prolific trends or rifts***. They
> have a great team of geologists, with a significant
> understanding of the properties, and we look forward to
> working together to realize ***the potential of this ground***.

JA-948 ¶ 105 (emphasis in original).

Defendant McDonald's statements concerning the "exploration
opportunities" and "potential of this ground" were not forward-looking because they
contain embedded facts about the current conditions of the Nevada Mines based on
his earlier due diligence and the understanding he learned from the geologists at the
Nevada Mines. As confirmed by CIs 10, 13 and 14, exploration opportunities had
been exhausted, exploratory drilling had ceased, and the cornerstone property of the
Nevada Mines, Fire Creek, contained refractory ore that could not be profitably
extracted without substantial additional capital. JA-910-17, 937 ¶¶ 13, 78. The result
was that operational costs were prohibitive and that the mine was uneconomic. JA-

31

937 ¶ 77.

### 3. July 23, 2018 Statements

Defendant Baker's statement on July 23, 2018 announcing that the Company had closed the acquisition of the Nevada Mines stated, in part: "[w]ith this acquisition, ***Hecla now has three high-grade mines*** in Nevada, one of the best mining districts in the world. . . ***These assets immediately add production*** and ***cash flow . . .***" JA-953 ¶ 115 (emphasis in original). This statement pertains to assets that Hecla acquired through the acquisition of the Nevada Mines and makes present tense assertions about the quality and nature of the gold ore, production and cash flow. As set out above, these statements were a false contemporary account of the state of production and cash flow at the Nevada Mines. The term "now has" is not forward looking under any linguistic convention.

### 4. Hecla's Corporate Updates

Hecla's published presentations from October through December 2018 and in January 2019 that Fire Creek has "***Current reserves and resources provide mining inventory out to 2023***" is explicitly not forward-looking and describes "[c]urrent reserves." JA-958, 962-64 ¶¶ 130, 143, 147, 149 (emphasis in original). Defendants were well aware that this statement was false when made—reserves at this time were 40% lower. JA-917 ¶ 13(b)(vii).

### 5. November 8, 2018 Statement

Defendant Baker's November 8, 2018 statement: "we don't believe we will need to make significant new financial investment to put the mine on the same improvement path that we have seen at Greens Creek and Casa Berardi," (JA-959-60 ¶ 135) is not forward-looking because it is describing Defendants' contemporaneous assessment of the investments required at the Nevada Mines to operate them on a cash flow positive basis.

### 6. December 4, 2018 Statement

Defendant Hall stated during a December 4, 2018 conference call that: "***There's no major capital expenditures that we can't fund out of the Nevada operations***. So we're really quite pleased with the transaction." JA-963 ¶ 145 (emphasis in original). This statement describes the Nevada Mines' current funding capabilities and is therefore not forward-looking. The second sentence describes the Defendants' contemporaneous views about the transaction and does not reflect any future projections.

### 7. January 19, 2019 Statement

Hecla's January 2019 investor presentation stated: "Mine Life at our most important mines are long ***and getting longer***" does not fall within the definition of a forward-looking statement because it is not providing any future projection but rather describing the Nevada Mines' current mine life. JA-964 ¶ 151 (emphasis in

original). As already discussed, Hecla was well aware that this statement was false when made—reserves at this time were 40% lower, the Nevada Mines were in terminal decline and their mine life had decreased. JA-917 ¶ 13(b)(vii).

### B. Material Omissions Are Not Protected by the PSLRA's Safe Harbor

This District Court erred in finding Defendants' statements were protected by the safe harbor because the Complaint alleges that Defendants' representations were misleading by omission, including omission of: (1) the excess water problem plaguing Fire Creek; (2) the lack of adequate and appropriate water permits and infrastructure at the Nevada Mines; (3) the refractory ore at Fire Creek; (4) the lack of adequate and proper equipment at the Nevada Mines; (5) the loss of key personnel at the Nevada Mines and costly contractors; and (6) the suspension in exploratory drilling to discover new potential mines. JA-930-43 ¶¶ 55-94.

Courts in the Second Circuit have held that material omissions of known conditions that undermine the accuracy of statements are not protected by the PSLRA safe harbor. *Rudani v. Ideanomics, Inc.*, No. 19 Civ. 6741 (GBD), 2020 WL 5770356, at *5-6 (S.D.N.Y. Sept. 25, 2020) (finding defendant made material misrepresentations by omission of material facts where defendant, in announcing an acquisition, gave positive revenue guidance based on that acquisition while knowing of undisclosed facts tending to undermine the accuracy of the statements). Even where an issuer provides cautionary language, failure to disclose known problems

and uncertainties is not protected by the safe harbor. *See Galestan*, 348 F. Supp. 3d at 304 ("[C]ourts in the Second Circuit have consistently held that 'the PSLRA safe harbor [provision] ... [does not] protect [ ] material omissions.' . . . Plaintiff alleges that Defendants failed to disclose problems and uncertainties, of which they had knowledge, that related to the integration of OneMain Financial branches into the combined Company and that, if disclosed, would have influenced the decisions of reasonable investors as to the purchase or sale of the Company's securities. Since these allegations relate to omissions of material information, the PSLRA safe harbor provision cannot insulate the challenged statements."); *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102–03 (S.D.N.Y. 2006) (finding cautionary language not meaningful because company "did not disclose that the risk factors were not merely hypothetical (i.e., they 'could' happen), but were in fact happening . . . this allegation, if proven, would take the forward-looking disclosures out of the PSLRA's Safe Harbor—not because defendants did not identify the correct risk factors, but because the disclosures failed to warn investors that the risk factors were not hypothetical—which, of course, dramatically increased the possibility of adverse consequences.").

## C.    Defendants' Statements Lacked Meaningful Cautionary Language

Assuming, *arguendo*, that portions of the above statements were forward-looking, the District Court erred in holding that Defendants' "forward-looking

statements were accompanied by meaningful cautionary language." SPA-15-17 (citing Hecla's cautionary statements on March 19, 2028, JA-182-83). The warnings identified by the District Court were generic and vague and could apply to any company involved in an acquisition. For example, the District Court found meaningful Hecla's warning that it "may not be able to 'identify liabilities associated with the acquired properties' and that '[e]ven a detailed review of records and properties may not necessarily reveal existing or potential problems or permit a buyer to become sufficiently familiar with the properties to fully assess their condition, any deficiencies, and development potential.'" SPA-16 (citing risk factors in Hecla's annual report filed with the SEC on Form 10-K for the year ended December 31, 2017, JA-736, 745).

Strikingly, each of these cautionary statements was a generic warning about the risk of unknown future contingencies. None addressed the known risks that are identified with particularity in the Complaint and confirmed by multiple CIs. The Complaint alleges a plethora of material negative conditions at the Nevada Mines during due diligence that had transpired and were expected to continue to drain cash flows and hamper production. JA-910-17, 930-43 ¶¶ 13, 55-94. Any venture carries the risk of unknown unknowns. The Complaint, by contrast, details allegations of known facts, that is, problems already known to Defendants and that were and would continue to negatively affect operations and production in the future, but undisclosed

to the investor Class.

"Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d. Cir. 2014). Furthermore, "'cautionary language that is misleading in light of historical fact cannot be meaningful.'" *Galestan*, 348 F. Supp. 3d at 297 (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 (2d Cir. 2010)). This Court has repeatedly held that "'[t]o avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information.' . . . 'Vague' disclaimers are inadequate.'" *In re Vivendi*, 838 F.3d at 247 (citing *Slayton*, 604 F.3d at 772).

Courts have found in the merger and acquisition context that risk warnings similar to Defendants are boilerplate and not meaningful. For example, in *Galestan* the court rejected the warnings that "[i]t is possible that the integration process could take longer than anticipated and could result in the loss of valuable employees, additional and unforeseen expenses, the disruption of our ongoing business, processes and systems . . . any of which could adversely affect our ability to achieve the anticipated benefits of the OneMain Acquisition" because such boilerplate and general language is not "'meaningful' cautionary language." *Galestan*, 348 F. Supp. 3d at 304; *see Haw. Structural Ironworkers Pensions Tr. Fund v. AMC Ent.*

37

*Holdings, Inc.*, 422 F. Supp. 3d 821, 847 (S.D.N.Y. 2019) ("general warnings in AMC's SEC forms, about 'execution risks' relating to AMC's acquisitions, unspecified 'known . . . risks [and] uncertainties,' and more specifically to the risk that 'optimizing [AMC's] theater circuit through construction and the transformation of our existing theaters may be subject to delay and unanticipated costs,' . . . may be too general to constitute 'meaningful cautionary statements.'").

Furthermore, the District Court erred when it relied on the fact that Defendants' "warnings were substantively repeated throughout the Class Period in Hecla's public disclosures" to conclude that "[t]hese warnings, when read together, caution investors of the very risks that Plaintiffs allege ultimately occurred – namely that the Nevada Mines were not in the condition they were initially thought to be and that the cost of operating those mines would ultimately be higher than expected." SPA-16-17. The Complaint specifies the failure to disclose what was known internally at the Company. JA-951, 958, 962 ¶¶ 111, 128-29, 141-42. Moreover, even if the generic risk warnings are credited for putting investors on notice, the fact remains that Defendants' risk warning did not materially change while the Complaint alleges that conditions deteriorated throughout the Class Period. JA-950-51, 958, 962 ¶¶ 110-11, 128-29, 141-42. The warnings credited by the District Court in Hecla's first quarter 2018 10-Q were repeated, unchanged in Hecla's 10-Qs for the second and third quarters of 2018. JA-958, 962 ¶¶ 128, 140-41.

Repeated generic warnings that do not reflect the deteriorating financial situation are simply not meaningful. In fact, repeating the same warnings regardless of context inures the listener to any risk that the message might be thought to convey. This Court in *Slayton* explained that their conclusion regarding the insufficiency of the cautionary language was "bolstered by the fact that the defendants' cautionary language remained the same even while the problem changed." 604 F.3d at 772-73. Therefore, contrary to the District Court's finding, the substantively same boilerplate warnings made by Defendants throughout the Class Period were insufficient to invoke the PSLRA's safe harbor.[7]

### D.    Defendants' Representations Were Not Puffery or Corporate Optimism

The District Court erred in holding that Defendants' misrepresentations "largely seem to be expressions of 'puffery and corporate optimism'" that "'do not give rise to securities violations.'" SPA-17. However, Defendants' representations, when viewed in context, concretely assured investors about the quality and nature of the assets in which Defendants were investing shareholders' capital. Courts have

---

[7] The District Court concluded its analysis stating: "Moreover, Defendants disclosed throughout the Class Period that various risks had materialized—actual negative conditions and poor performance in Nevada. That Hecla adhered to SEC regulations by also disclosing the possibility that additional adverse conditions could arise, or that current conditions could worsen, is not misleading." SPA-17. The District Court did not in the first instance identify or reference the risks it found had materialized and there is no support in the record for the District Court's description of the disclosures.

found that statements cannot be dismissed as puffery where they reassure investors as to specific risks or contradict facts known to a defendant. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 223 (S.D.N.Y. 2022).

For example, representations deemed to be puffery by the District Court contained assertions about existing facts, while, as outlined above, the Complaint alleges Defendants knew that the contrary was true. SPA-13-15 ("Hecla now has three high-grade mines," "These assets immediately add production and cash flow," "share-holders can benefit from the 162,000 gold equivalent ounces a year of production"). Similar "misrepresentations of existing facts" were found actionable by this Court in *Novak*, 216 F. 3d at 315 (statements that the "inventory situation was 'in good shape' or 'under control'" were not "expressions of optimism, and other puffery"); *see also In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) (statements concerning defendant's credit portfolio, including that it was "strong," "robust" and "consistent" not puffery where defendant failed to disclose "additional fact necessary to make the statements already contained therein not misleading").

Defendants' representations about the "exploration opportunities" and "opportunities for improvement" similarly misled investors about the current conditions at the Nevada Mines and risks, when they knew of material negative conditions that were and would continue to hamper production and cash flow. For

example, at no point did Defendants even mention the problem with refractory ore. This is not a matter of oversight or puffery. The presence of refractory ore is a critical question in the productivity of any gold mining operation. The allegations establish that this was material, it was known, and it was not disclosed.

The court's decision in *SEC v. Rio Tinto PLC* illustrates the misleading nature of these representations. In *Rio Tinto*, after a meeting where data indicated that the mine was "a lemon," the company's CEO represented that the mine had "more potential in total as [it went] forward." *SEC v. Rio Tinto PLC*, No. 17-cv-7994 (AT), 2019 WL 1244933, at *11 (S.D.N.Y. Mar. 18, 2019). The court found this statement actionable because "the SEC has plausibly alleged that [the CEO] described [the mine] as having significant potential going forward, when he knew or had reason to believe that it had no potential at all." *Id*. Likewise, Defendants misled investors by touting exploration and improvement opportunities at the Nevada Mines while knowing and not disclosing material negative conditions and risks that were and would continue to hinder such opportunities. JA-971-74 ¶¶ 173-75, 176-77.

Further, "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *Ark. Teacher Ret. Sys. v. Bankrite, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014); *U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, No. 12 Civ. 6811(CM)(JCF), 2013 WL 791462, at *7 (S.D.N.Y. Mar. 5, 2013). Here, the District

41

Court ignored key facts that provided context. For example, the District Court isolated Defendant McDonald's statement noting his "excite[ment] about the exploration opportunities in Northern Nevada," to make it sound like a simple statement of enthusiasm. SPA-17. What the District Court omitted was that Defendant McDonald's enthusiasm was accompanied by statements that the exploration ground "lies within or at the intersection of prolific trends or rifts" and that "[Klondex has] a great team of geologists, with a significant understanding of the properties . . ." SPA-17. This context is key in showing how Defendants reassured investors about the nature and conditions of the Nevada Mines with misleading information. Similarly, as to Defendant Baker's statement representing the "significant opportunity for improvement," the District Court omitted the part of that statement in which Defendant Baker provided specific context. Defendant Baker also stated that "[t]hese assets immediately add production and cash flow" and that Hecla "now has three high-grade mines in Nevada" in the context of the Nevada Mines' present "productivity and consistency." SPA-14, 17. The District Court erroneously assessed Baker's statements in a vacuum and in isolation. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) ("While certain statements, 'viewed in isolation, may be mere puffery,' when the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may become

material to investors.").

The District Court's reliance on *Rombach v. Chang* in finding that Defendants' misstatements were puffery was misplaced. SPA-17. While this Court in *Rombach* noted that "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view," they must also take such a view in light of "what current data indicates." 355 F.3d at 174. At the time Defendants made statements about production and cash flows, the undisclosed data known to Defendants showed the Nevada Mines were troubled assets from the outset.

Likewise, the District Court's reliance on *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 55 (S.D.N.Y. 2018), is misplaced. SPA-17-18. In *Xerox*, statements like the company's platform "helps us differentiate ourselves from competitors around the world" and about the company's "successful implementation" of initiatives, were vague, amorphous, and non-verifiable. *Xerox*, 300 F. Supp. 3d at 569-70. In contrast, the District Court ignored Defendants' representations containing verifiable facts, such as "[t]hese assets immediately add production and cash flow," and "share-holders can benefit from the 162,000 gold equivalent ounces a year of production." SPA-13, 17. Defendant Baker's statements conveyed "meaningful, objective data that an investor would rely upon," and are therefore not puffery.

### E. Defendants' Statements Describing the Nevada Mines as "High Grade" Were Materially False and Misleading

The Complaint alleges that Defendants' repeatedly represented that the Nevada Mines were a "high-grade" gold operation. A-944, 953-54, 958, 962-64 ¶¶ 96, 115, 118, 130, 143, 147, 149. The District Court erred in holding that statements regarding Hecla's "high-grade" mines are not actionable because they are not false or misleading. SPA-18-20.[8] The District Court's finding that the Complaint did not identify any allegation of fact showing that the Nevada Mines were not high-grade missed the point. When Defendants made positive representations of "high-grade" gold they had a duty to disclose material, negative contrary facts in order avoid misleading investors about the nature and quality of the gold ore at the Nevada Mines—that the gold ore was uneconomic refractory gold ore. When a company choses to speak, it has "a duty to be both accurate and complete." *Caiola v. Citibank, NA., NY,* 295 F.3d 312, 331 (2d Cir. 2002). Simply put, the economics of mining are not determined solely by the grade of the ore but by whether it can be profitably mined.

The District Court further found that Plaintiffs conflated ore grade with whether it is economic to extract it and that any assumption about profitability was

---

[8] While the Order focused one particular statement concerning high-grade ore, the District Court's analysis broadly considered and dismissed these allegations. SPA-18-20.

"Plaintiffs' own doing." SPA-19. This too was erroneous because, on the contrary, Defendants' positive representations that the Nevada Mines contained "high-grade gold" and were producing "robust cash flows" created the misimpression that the high-grade gold ore was being mined profitably or at least on a cash neutral basis. JA-944-45, 953-54, 959-60, 963-64 ¶¶ 96, 115, 118, 135, 149. Indeed, in Hecla's March 19, 2018 presentation titled "Adding High-Grade Nevada Gold Mines," Defendants linked the gold grade to "low cash costs and strong cash flow." JA-182, 194. It was not until the end of the Class Period that investors learned the truth when Defendant Baker admitted that the Nevada Mines contained refractory ore and that while "relatively high grade," the costs "are too high." JA-978 ¶ 187 (Defendant Baker: "There's a lot of resource and mineralization that is relatively high grade, but the current cost per ton and development costs are too high . . . [we're] seeing more refractory ore…").

The District Court credited Defendants' argument that increased costs at the Nevada Mines were disclosed, suggesting that investors were on notice that profitability was declining. SPA-18-19. This was erroneous. *See Textron,* 14 F.4th at 147 (reversing dismissal on falsity grounds, in part, because "the District Court in effect required [plaintiffs] to show that [their] reading was superior to the court's own benign reading of those statements a requirement we have described as error"). Nowhere in Hecla's or Klondex's disclosures was the term refractory gold ore even

mentioned. Throughout the Class Period, Defendants consistently represented the Nevada Mines as a great economic opportunity for investors that was and would continue to generate robust cash flow and production at a low cash cost. This was knowingly false.

## **CONCLUSION**

For the foregoing reasons, the District Court's grant of Defendants' motion to dismiss the Complaint should be reversed.

DATED: December 20, 2024  Respectfully submitted,

KAPLAN FOX & KILSHEIMER LLP

*/s/ Jeffrey P. Campisi*

Robert N. Kaplan
Jeffrey P. Campisi
800 Third Avenue, 38th Floor
New York, NY 10022
T: (212) 687-1980
F: (212) 687-7714
rkaplan@kaplanfox.com
jcampisi@kaplanfox.com

Samuel Issacharoff
40 Washington Square South
New York, NY 10012
(212) 998-6580
si13@nyu.edu

*Counsel for Lead Plaintiff-Appellants*

## Certificate of Compliance with Type-Volume Limit, Typeface <u>Requirements, and Type-Style Requirements</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of 2d Cir. R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,779 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman font.

Dated: December 20, 2024         */s/ Jeffrey P. Campisi*
                                                  Jeffrey P. Campisi

# SPECIAL APPENDIX

i

# Table of Contents

**Page**

Opinion and Order of Honorable Andrew L. Carter, Jr.,
Dated September 30, 2024, Appealed From .............................SPA-1

Judgment of Honorable Andrew L. Carter, Jr.,
Dated November 27, 2024, Appealed From ............................SPA-22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT GLUCK, et al.,

                          **Plaintiffs,**

        -against-

HECLA MINING CO. et al.,

                          **Defendants.**

---

**19-cv-4883 (ALC)**

**OPINION AND ORDER**

---

**ANDREW L. CARTER, JR., United States District Judge:**

        Lead Plaintiffs Robert Gluck, Emma Gluck and Sarah Gluck ("Plaintiffs") bring this securities class action against the Hecla Mining Company ("Hecla"), Phillips S. Baker, Jr. ("Baker"), Lindsay A. Hall ("Hall") and Lawrence P. Radford ("Radford") (collectively "Defendants") alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of themselves and a class of all persons who purchased the publicly traded common stock of Hecla between March 19, 2018 and May 8, 2019 (the "Class Period"). Currently pending before the Court is Defendants' motion to dismiss the Second Amended Complaint (ECF No. 130). For the reasons stated below, the motion is **GRANTED**.

## BACKGROUND

### A. Factual Background[1]

        This dispute arises from Hecla's July 2018 acquisition of Klondex Mines, Ltd. ("Klondex"). On March 19, 2018, Hecla, a mining company, announced that it was acquiring Klondex—a company that operated three high-grade gold mines in Nevada (the "Nevada

---

[1] The following facts are drawn from the Second Amended Complaint (ECF No.124, "SAC") and documents relied upon therein.

1

SPA-2

Mines"). (Sec. Am. Compl., ECF No. 124 ¶ 7.)  In sum, Plaintiffs allege that Defendants made materially false and misleading statements and failed to disclose material adverse facts regarding Hecla's business, operations and prospects related to Klondex and the Nevada Mines.  (*See generally id.*)

### i.  The Parties

Lead Plaintiffs purchased Hecla common stock during the Class Period and have brought suit on behalf of all other individuals similarly situated against Hecla and several of its officers: (1) Defendant Baker, Hecla's CEO, (2) Defendant Hall, Hecla's CFO and Treasurer, (3) Defendant Radford, Hecla's Vice President of Operations, and (4) Defendant McDonald, Hecla's Vice President of Exploration (the "Individual Defendants").  (*Id.* ¶¶ 39–45.)  Plaintiffs allege that the Individual Defendants were provided with copies of Hecla's press releases and "possessed the power and authority to control the contents of Hecla's press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market." (*Id.* ¶ 45.)

### ii.  The Nevada Mines and Defendants' Due Diligence

Plaintiffs allege that Hecla began "technical due diligence of the Nevada Mines" in or around November 2017.  (*Id.* ¶ 49.)  This included access to the mines and Klondex's personnel, onsite physical inspections of the condition of the properties, and access to documents and records maintained by the mines.  (*Id.* ¶ 49.)  Plaintiffs allege that through this due diligence, Defendants learned of several material problems with the Nevada Mines which would affect the ability of the Mines to be profitable once the acquisition of Klondex was completed; however, Plaintiffs allege that Defendants did not disclose these problems to the public.  (*Id.* ¶¶ 173, 176.)

SPA-3

In support of Plaintiff's assertion that Defendants were aware of or recklessly disregarded the truth of the problems plaguing the Nevada Mines, Plaintiffs primarily rely on the statements of twelve Confidential Informants ("CIs") who assert that there were significant operational problems affecting the Nevada Mines since before Hecla announced the potential acquisition. (*Id.* ¶ 64.)  These CIs consist of former employees, including miners, surveyors, operators, IT support professionals, environmental coordinators, engineers.  (*See id.* ns.6–17.)  The problems included a serious water management issue at the Fire Creek mine whereby water continually collected at the bottom of the mine.   (*See id.* ¶¶ 58, 59, 60, 67, 68, 69, 71, 77, 80, 92.)  Plaintiffs also allege that the Nevada Mines "lacked equipment needed to excavate and process material." (*Id.* ¶¶ 66, 68.)  Additionally, one informant stated that he knew that the cost of excavation of gold ore at Fire Creek would increase because the pH balance in the "wash plant" where the ore is extracted was higher than previously thought.  (*Id.* ¶ 68.)  Another informant stated that two veins at the Fire Creek mine did not contain high grade ore and were thus unable to "produce profitable material."  (*Id.* ¶ 90.)  Several informants also allege that throughout the Class Period, problems of poor ore quality plagued the Nevada Mines.  (*see, e.g., id.* ¶ 94.)

### iii.  Defendants' Alleged Misstatements and Omissions During the Class Period

Plaintiffs allege that Defendants did not disclose the extent or severity of the above-mentioned problems with the Nevada Mines beginning on March 19, 2018, when it publicly announced its acquisition of Klondex.  These misstatements and omissions were made in Hecla's routine filings with the Securities and Exchange Commission ("SEC") and associated press releases and public statements.

SPA-4

On March 19, 2018, in announcing the potential Klondex acquisition, Defendant Baker, Hecla's CEO, stated that he expected the deal to be "accretive on many important financial and credit metrics" and that the Nevada operations would require "a small amount of capital" and would be "cash flow positive." (*Id.* ¶¶ 36, 96-97, 99.) The press release indicated that "[a]fter extensive due diligence . . . We expect this transaction to be accretive on many important financial and credit metrics" and that "Fire Creek is a cornerstone producing asset with robust cash flows." (*Id.* ¶¶ 7, 96, 99.) Additionally, during a conference call with investors and analysts, Baker stated that the Nevada Mines "will be cash flow positive for us." (*Id.* ¶¶ 22, 99)

On May 10, 2018, in Hecla's first quarterly report filed with the SEC on Form 10-Q, Plaintiffs allege that Hecla failed to disclose "[t]he ongoing material, negative problems that were negatively affecting operations and that were growing worse at the Nevada Mines." (*Id.* ¶ 108.) In a conference call with investors, Baker said: "When we looked at Klondex ... we saw extraordinary grades." (*Id.* ¶ 103.) Plaintiffs also allege that the cautionary language that warned of future potential risks that "may" or "could" adversely affect Hecla's business were insufficient and materially false and misleading because those "future" risks had in fact already materialized. (*Id.* ¶¶ 109-11.)

On July 23, 2018, the day the acquisition of Klondex was completed, Defendant Baker stated publicly that "Hecla now has three high-grade mines in Nevada" that would "immediately add production and cash flow." (*Id.* ¶ 115.) A few days after the acquisition was finalized, on August 9, 2018, Hecla issued a press release that reported its financial results for the second quarter of 2018 which stated "[w]e have now closed the acquisition of the high-grade Nevada mines . . . Our plan is to operate the mines and mill as one unit, allocating the workforce and

capital to generate margins and focus on profitability, not just on production for production's sake." (*Id.* ¶ 118.) On the associated conference call, Baker said that he "expect[ed]" that the Nevada assets would be "basically self-funding" for 2018. (*Id.* ¶¶ 120, 121.) Additionally, in response to an analyst's question about permits for the Nevada Mines, Baker stated "Yeah. We've got everything we need." (*Id.* ¶ 123.) Hecla also incorporated into its Form 10-Q its prior disclosures about the potential future risks that could affect the Nevada operations, which Plaintiffs maintain were fraudulent. (*Id.* ¶ 128).

On November 8, 2018, during a conference call regarding Hecla's financial results, Baker stated that "[w]e think we can run it pretty close to cash flow neutral" and that the Nevada Mines would allow them to generate "margin" that "should not only improve our equity value, but also our credit metrics and the rating agencies are beginning to take notice of this as exemplified by our bond rating upgrade by S&P." (*Id.* ¶¶ 125, 137.) Regarding the Fire Creek mine, Defendant Radford, Hecla's Vice President of Operations, explained: "we encountered existing poor ground conditions, many development phases were in unconsolidated tuff, which is basically clay rich, add a little bit of water and the conditions turn to mush" but also stated that "our goal for Nevada operations is that the operations are cash-neutral[.]" (*Id.* ¶ 137.) In the associated press release, Hecla also disclosed that "[t]he mining of select high-grade zones [at Fire Creek] has been moved from Q3 2018 into 2019 as the ore extended vertically farther than expected, and development is needed for full extraction of the ore panels." (*Id.* ¶ 133) Hecla also incorporated into its Form 10-Q its prior disclosures about the potential future risks that could affect the Nevada operations, which Plaintiffs maintain were fraudulent. (*Id.* ¶ 141)

Plaintiffs allege that Defendants' disclosures during this time continued to mask the true extent and severity of problems plaguing the Nevada Mines. On December 4, 2018, during a

SPA-6

conference call, Hall stated that "[t]here's no major capital expenditures that we can't fund out of the Nevada operations.  So we're really quite pleased with the transaction."  (*Id.* ¶ 129.)  On February 14, 2019, Hecla issued a press release with information about its exploration programs, including at Fire Creek.  (*Id.* ¶ 136)

Beginning in early 2019, Plaintiffs allege that Defendants began to make "partial disclosures" of the truth regarding the condition and profitability at the Nevada Mines.  On February 21, 2019, Hecla issued a press release filed with the SEC on Form 8-K which explained that Defendants had experienced "'challenges' with the conditions at the Nevada Mines."  (*Id.* ¶ 131.)  In the associated conference call, Baker and Hall both stated that they expected the Nevada operations to be "cash flow positive" for 2019, despite some of the challenges with the mines that had been disclosed in the Form 8-K.  (*Id.* ¶ 138.)  Regarding the Fire Creek mine, Defendant Radford disclosed that "we're looking at a bit more of a mobile dewatering plant so that we're not managing the water underground."  (*Id.* ¶ 140.)  Additionally, Hecla identified problems with the "tuff" material that it encountered at the Nevada Mines which would require additional equipment and costs to properly mine.  (*Id.* ¶ 154.)

On February 22, 2019, Hecla's Form 10-K disclosed risks that may or could affect the Nevada Mines, which Plaintiffs maintain was insufficient because the language did not fully disclose that these risks had in fact already occurred.  (*Id.* ¶¶ 164–66.)  After this "partial" disclosure, Hecla's stock price declined from of $2.39 per share to $2.74 per share.  (*Id.* ¶ 156.)  However, Plaintiffs maintain that this price was still "artificially inflated" because Defendants had not disclosed the full extent of the problems at the Nevada Mines.  (*Id.* ¶ 157.)

On April 18, 2019, Hecla issued a press release disclosing: "[a] minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a

higher discharge rate", which Plaintiffs maintain was false and misleading because it implied that the water discharge problems at the Nevada Mines were minor, when they were not.  (*Id.* ¶ 169.) This announcement caused a further share price decline from $2.28 per share to $2.15 per share. (*Id.* ¶ 170.)  However, Plaintiffs allege that this disclosure failed to fully explain the extent of the problem, whereby excess water had been leaking at the Fire Creek since 2017 and throughout the Class Period.  (*Id.* ¶ 171.)  Plaintiffs note that "Hecla had been shipping water at great expense from the dewatering storage pond at Fire Creek to the Midas mine" because of the extent of water problems at the Fire Creek mine.  (*Id.* ¶ 171.)

### iv. Defendants' Announcement of a Review of Spending and Operations at the Nevada Mines

Plaintiffs allege that Defendants finally fully disclosed the extent and severity with the issues plaguing the Nevada Mines in May 2019.  On May 9, 2019, during a conference call with investors, Defendant Baker discussed the review for the Nevada Mines and the suspension of operations at those mines.  (*Id.* ¶ 173.)  During this conference call, Defendant Baker also discussed when these problems first began to emerge, stating:

> "A year ago when doing the due diligence, we recognized certain problems with Fire Creek dealing with the tuff material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types.
>
> And while we've made progress in dealing with the issues we saw the short answer is it's not been enough. The advance rate has increased, but the mill tonnage decreased by a similar percentage in the last quarter.
>
> And while we've done things to manage the water, the amount of water has increased, making the conditions worse. This has limited our access, and while they're not insurmountable and not a large amount of dollars, they will require quarters to construct some infrastructure and get some permit limits changed."

7

(*Id.* ¶ 173.)  Plaintiffs maintain that this disclosure "shocked investors" and caused Hecla's share price to decline from $2.04 per share to $1.77 per share.  (*Id.* ¶¶ 148–152.)

The next day, on May 10, 2019, Hecla filed its quarterly Form 10-Q, which stated:

> "We are currently undertaking a review of spending at the Nevada operations which may result in the following changes at the Fire Creek mine: a reduction in capital spending; ceasing current production and only developing to spirals 9, 10 and 11; or a temporary cessation of all mine operations at Fire Creek.  As a result, the values of certain components of properties, plants, equipment and mineral interests could be adjusted in the second quarter of 2019 when we expect to finalize the allocation of the Klondex purchase price.  The outcome of the review may constitute a triggering event requiring assessment of the carrying value of our long-lived assets at Fire Creek with the potential to impact near term estimated cash flows. . . . We may recognize an impairment, which could be material, if the carrying value of the assets exceeds the estimated future undiscounted cash flows expected to result from their use and eventual disposition. . . ."

(*Id.* ¶ 180.)

Scotiabank characterized the announcement as a "a complete reversal" in Hecla's outlook on the Nevada mine since Hecla acquired Klondex.  (*Id.* ¶ 181.)  This announcement caused Hecla's stock price to decline from $1.77 per share to $1.56 per share.  (*Id.* ¶ 184.)

On June 6, 2019, following its review of the Nevada Mine operations, Hecla issued a press release indicating that "changes are being made with the goal of turning [the Nevada Mines] into a positive cash flowing unit."  (*Id.* ¶ 185.)  Hecla determined that it would continue to mine "developed ore" at Fire Creek, that Midas would continue production through the end of 2019, but that the Hollister mine would be shut down.  (*Id.*)  After this announcement, the S&P downgraded Hecla's credit rating.  (*Id.* ¶¶ 191-92.)

In February 2020, Hecla disclosed that it refinanced the Company's debt at a higher interest rate. (*Id.* ¶ 201.)

8

SPA-9

### B.  Procedural Background

Plaintiffs filed the Complaint on May 24, 2019.  (ECF No. 1.)    Plaintiffs filed a consolidated Amended Complaint on September 9, 2020.  (Am. Compl., ECF No. 86.)  On May 25, 2020, the Court appointed the Gluck Family as Lead Plaintiffs and consolidated this action with *Bhattacharya v. Hecla Mining Co. et al.*, 1:19-cv-05719 (ALC).  (ECF No. 80.)

Defendants filed a motion to dismiss on December 9, 2020, (ECF No. 95), which the Court granted on February 22, 2023 (ECF No. 116, "Ord."). Plaintiffs filed their Second Amended Complaint on April 4, 2023 (ECF No. 124), and Defendants filed their Motion to Dismiss the Second Amended Complaint on May 12, 2023 (ECF No. 130). Plaintiffs filed their Opposition on June 21, 2023 (ECF No. 133). Defendants filed their Reply on July 21, 2023 (ECF No. 137). This Motion is fully briefed.

## LEGAL STANDARDS

### A.  Motions to Dismiss under Rule 12(b)(6)

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679.  A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer

possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's

liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 557).  The Court's function on a motion to dismiss is "not to

weigh the evidence that might be presented at a trial but merely to determine whether the

complaint itself is legally sufficient."  *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In deciding a motion to dismiss a securities action, the Court may consider "any written

instrument attached to the complaint, statements or documents incorporated into the complaint

by reference, legally required public disclosure documents filed with the SEC, and documents

possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a

court may take judicial notice.  *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010)

(quoting *ATSI Commc'ns*, 493 F.3d at 98); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

**B.  Section 10(b) and Rule 10b-5**

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege:

"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance

upon the misrepresentation; (5) economic loss; and (6) loss causation."  *Halliburton Co. v. Erica

P. John Fund, Inc.*, 573 U.S. 258, 267, (2014); *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23

(2d Cir. 2017).

"'The test for whether a statement or omission is materially misleading'. . . is not whether

the statement is misleading in and of itself, but 'whether the defendants' representations, taken

together and in context, would have misled a reasonable investor.'"  *In re Vivendi S.A. Sec.

Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d

Cir. 2004). This is an objective test that looks to the understanding of an "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). Importantly, "literal accuracy is not enough. An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.* at 192. "However, Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information." *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 397 (S.D.N.Y. 2020) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Thus, issuers have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. 240.10b-5(b)).

### C. Fed. R. Civ. P. 9(b) and the PSLRA

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal

11

SPA-12

citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). Under this heightened pleading standard for scienter, a plaintiff will sufficiently allege scienter and a complaint will survive, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## DISCUSSION

When dismissing the first amended complaint, this Court found that "[g]iven Defendants' disclosures regarding the negative conditions at the Nevada Mines and the paucity of allegations supporting Plaintiffs' allegations of scienter and falsity, the Court is doubtful that an amendment would certainly cure these defects." Ord. at 26. Such doubt has been substantiated. Drawing all reasonable inferences in Plaintiffs' favor, the Court again finds that Plaintiffs have not articulated sufficient factual allegations to carry their assertions beyond the speculative level: Plaintiffs new allegations do not plead with particularity any false or misleading statement, and many of Defendants' alleged misstatements are protected by the PSLRA safe harbor.

### I.    Plaintiffs Do Not Plead with Particularity Any False or Misleading Statement

### A.  Safe Harbor for Forward-Looking Statements

A "forward-looking statement" is (1) "a statement containing a projection of revenues, income. . . or other financial items," (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," or (3) "a statement of future economic performance." 15 U.S.C. § 78u-5(i)(1)(A)-(C); *see also In re Vivendi*, 838 F.3d at 246. These statements are subject to the PSLRA's "Safe Harbor", which provides, in relevant part, that:

> [A] defendant is not liable if (1) the forward-looking statement is
> identified and accompanied by meaningful cautionary language,

SPA-13

> (2) the forward-looking statement is immaterial, or (3) the plaintiff
> fails to prove that the forward-looking statement was made with
> actual knowledge that it was false or misleading. Because the safe
> harbor is written in the disjunctive, a forward-looking statement is
> protected under the safe harbor if any of the three prongs applies.

*Id.* at 245–46 (citation omitted). To qualify as "meaningful," cautionary language must "convey[] substantive information" and cannot be "boilerplate" or "vague." *Id.* at 247 (citation omitted). However, "[t]he cautionary language need not directly precede or follow the forward-looking statement for it to be meaningful." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020), aff'd, 847 F. App'x 35 (2d Cir. 2021) (citing *Slayton v. American Exp. Co.*, 604 F.3d 758, 768–69 (2d Cir. 2010)).

Plaintiffs do not put forth any new allegations, with specificity, that would alter the Court's holding that most of the challenged statements were forward-looking and thus inactionable under PSLRA's safe harbor provision. And Plaintiffs do not allege with particularity that any of the newly alleged misstatements are actionable. Below are the newly alleged misstatements:

- On March 19, 2018, Hecla's announcement of its agreement to acquire Klondex quoted a statement from Baker: "We can improve costs, grow reserves and expand production … share-holders can benefit from the 162,000 gold equivalent ounces a year of production." (SAC ¶ 96 "Statement 1")

- On May 10, 2018, during a conference call with investors and analysts in which the Individual Defendants participated, Defendant Baker represented that concerning the Nevada Mines "[w]e saw three large, in this case, Nevada properties as big as those that we already have, and we saw extraordinary grades." (SAC ¶ 103 "Statement 2")

13

SPA-14

- On May 10, 2018, McDonald said on an earnings call: "I'm very excited about the exploration opportunities in northern Nevada once the acquisition of Klondex is concluded … [I]t is rare that you can acquire 110 square miles of exploration ground in northern Nevada that lies within or at the intersection of prolific trends or rifts. They have a great team of geologists, with a significant understanding of the properties, and we look forward to working together to realize the potential of this ground." (SAC ¶ 105 "Statement 3")

- On July 23, 2018, when announcing the Company had closed the acquisition of the Nevada Mines from Klondex, Baker stated: "With this acquisition, Hecla now has three high-grade mines in Nevada, one of the best mining districts in the world . . . These assets immediately add production and cash flow, and because they are a good fit with Hecla's expertise, we believe there is significant opportunity for improvement in the mines' productivity and consistency."  (SAC ¶ 115 "Statement 4")

- In October-December 2018, Hecla published presentations that stated about Fire Creek: "Current reserves and resources provide mining inventory out to 2023." (SAC ¶¶ 130, 143, 147 "Statement 5")

- On November 8, 2018, Baker stated: "we don't believe we will need to make significant new financial investment to put the mine on the same improvement path that we have seen at Greens Creek and Casa Berardi." (SAC ¶ 135 "Statement 6")

14

SPA-15

- During a December 4, 2018 conference call, Hall stated: "There's no major capital expenditures that we can't fund out of the Nevada operations. So we're really quite pleased with the transaction" (SAC ¶ 145 "Statement 7")

- A January 2019 investor presentation stated: "Mine Life at our most important mines are long and getting longer." (SAC ¶ 151 "Statement 8")

Of the newly alleged misstatements, the Court finds that Statements 1 and 3-8 are forward-looking. These statements "fall squarely within the definition of 'a statement containing a projection of ... income (including income loss), earnings (including earnings loss) per share, ... or other financial items" and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management." *Gray*, 454 F. Supp. 3d at 386 (quoting 15 U.S.C. § 78u-5(i)(1)(A) & (C)). However, the Court finds that Statement 2 is not forward-looking and thus not covered by the statutory safe harbor.

The Court finds that Defendants' forward-looking statements were accompanied by meaningful cautionary language.   Meaningful cautionary language must include the "important factors that could realistically cause results to differ materially." *Slayton*, 604 F.3d at 773.   This language must be both "extensive and specific. . . .and must contain substantive company-specific warnings." *Gray*, 454 F. Supp. 3d at 392 (internal quotations and citations omitted). Hecla's Form 8-K, issued the same day the Klondex acquisition was finalized, contained statements cautioning that the report contained "forward looking statements" which involved "a number of risks and uncertainties that could cause actual results to differ materially from those projected, anticipated, expected or implied."   (ECF No. 96-2.)   The presentation also incorporated the risk disclosures made in Hecla's Form 10-K and 10-Q Reports. (*Id.*) Hecla's

15

SPA-16

Form 10-K from year-end 2017 contained discussion of specific risk factors that could prevent Hecla from realizing all the anticipated benefits of the Klondex acquisition. (ECF No. 96-16 at 17.) Those risks included "difficulties integrating operations and personal, higher than expected acquisition and operating costs. . . " (*Id.*) The disclosure also notes that various factors could impact its overall growth strategy, including "lower than expected ore grades" and "labor problems". (*Id.* at 10, 16.) The disclosure also noted that the acquired properties "may be in an unexpected condition". (*Id.* at 17.) In fact, the disclosure explained the risks of acquiring new properties, even with extensive due diligence, noting that Hecla may not be able to "identify liabilities associated with the acquired properties" and that "[e]ven a detailed review of records and properties may not necessarily reveal existing or potential problems or permit a buyer to become sufficiently familiar with the properties to fully assess their condition, any deficiencies, and development potential." (*Id.* at 17.)

These warnings were substantively repeated throughout the Class Period in Hecla's public disclosures. (*See, e,g.,* ECF No. 96-1 at 16–17 ("The properties we acquire in any acquisition, including our recently-acquired Nevada Operations unit, may not produce as expected, may be in an unexpected condition and we may be subject to increased costs and liabilities."); *see also* ECF No. 96-4 at 62–63 ("The Klondex properties and any others we may acquire may not produce as expected and may not generate additional reserves, and may come with liabilities beyond those known at the time of acquisition."))˙ *see also* id., ("the acquisition itself "may cause a loss of management personnel and other key employees of Klondex"; that Hecla may not achieve the anticipated benefits of the acquisition for reasons including "higher than expected acquisition and operating costs or other difficulties"; and that Klondex's mines "may be in an unexpected condition."). These warnings, when read together, caution investors

16

of the very risks that Plaintiffs allege ultimately occurred—namely that the Nevada Mines were not in the condition they were initially thought to be and that the cost of operating those mines would ultimately be higher than expected.  This language is sufficiently specific to insulate Defendants from liability for its forward-looking statements.  *See In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 534 (S.D.N.Y. 2021). Moreover, Defendants disclosed throughout the Class Period that various risks had materialized—actual negative conditions and poor performance in Nevada. That Hecla adhered to SEC regulations by also disclosing the possibility that additional adverse conditions could arise, or that current conditions could worsen, is not misleading. *Chapman*, 466 F. Supp. 3d at 406.

Accordingly, for the reasons stated above, Defendants' newly alleged forward-looking statements 1, 3-8 are protected by the PSLRA's safe harbor and are thus not actionable.

These statements also largely seem to be expressions of "puffery and corporate optimism" that "do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (citation omitted); *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020) ("Generic, indefinite statements of corporate optimism typically are not actionable."). Statements of puffery are so vague, broad, and non-specific that a reasonable investor would not rely on [them]."  *In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *17 (citations omitted). These vague statements, including phrases such as "we saw extraordinary grades," (Statement 2), noting "excite[ment] about the exploration opportunities in northern Nevada," (Statement 3), and detailing belief in "significant opportunity for improvement" (Statement 4), are precisely the kind of language that Courts in this district have found inactionable corporate puffery. *See, e.g., Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569-70 (S.D.N.Y. 2018) (statements suggesting "Xerox's confidence in its

SPA-18

competitiveness" and "vaguely and enthusiastically describ[ing] Xerox's performance, [and] expectations of business success" were non-actionable puffery); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."). *See Leadersel Innotech ESG v. Teladoc Health, Inc.*, 2024 U.S. App. LEXIS 24196, *5-6 (setting forth corporate optimism standards).

### B.  Statement 2 Is Not Materially Misleading or False

"'The test for whether a statement or omission is materially misleading'. . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004).  This is an objective test that looks to the understanding of an "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). *See also Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." (quoting *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010))).

Baker's statement, "[w]e saw three large, in this case, Nevada properties as big as those that we already have, and we saw extraordinary grades," (SAC ¶ 103), taken together and in context, would not have misled a reasonable investor. Plaintiffs do not identify any allegation of fact showing the Nevada Mines were not high grade. (Def. Br. at 20-21; Opp. at 3-4). Any

18

SPA-19

assumption about the profitability of these ores was Plaintiffs' own doing. Hecla disclosed processing costs—and they were high and increasing. Klondex had disclosed a 44% increase in costs of production at Fire Creek over the three-year period immediately before the acquisition. (Def. Br. at 2-3.) Then, Hecla's first financial report after the acquisition disclosed that production costs had skyrocketed from what Klondex had reported, with costs of production going from Klondex's reported $1,107/ounce to $1,932/ounce. (Id. at 5) Not only was that a 75% increase in costs, but it moved the cost of production above the price of $1,205 at which Hecla could sell gold. (Id.)

Plaintiffs contend this statement is false because Defendants "knew, or at least recklessly disregarded, and failed to disclose the material, negative fact that … Fire Creek contained refractory ore that could not be profitably extracted without substantial and uneconomical capital and operational costs." (Id. ¶ 104) But, as Defendants argue, Plaintiffs conflate the ore's "grade" with whether it is economic to extract it. Plaintiffs admit: "While refractory ore may be high grade, the costs to extract that gold can be astronomical." (SAC ¶ 11).

In *Colbert v. Rio Tinto PLC*, the Second Circuit upheld an SDNY's dismissal of conference statements made by coal mine investor because the complaint failed to plausibly allege that the statements in question were either false or materially misleading. *Colbert v. Rio Tinto PLC*, 824 Fed. Appx. 5, 9-10 (2d. Cir. 2020); *see, e.g.*, *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998) (noting that suits under Section 10(b) or Rule 10b-5 require the plaintiff to allege a false or misleading statement or omission). The Court noted that the statement that Defendant's presence in Africa was "growing" was truthful and as such it could not form the basis of a claim for securities fraud. *Id.* The Court noted, "[w]hile the mines investment may have been unwise, this is not, standing alone, enough to render the

19

SPA-20

statement that [Defendant's] presence was "growing" misleading or false." *Id.* Such is the case here. The statements regarding "high grade" mines are not actionable because they are neither false nor misleading. And, in any event, the phrase "we saw extraordinary grades," can likely be categorized as corporate optimism or puffery. *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations.").

Plaintiffs have failed to plead with specificity any false or misleading statement actionable under the securities laws.

## II.    Scienter

Because Plaintiffs have failed to plead any actionable misstatement or omission, the Court need not reach the question of whether Plaintiffs have adequately pleaded scienter. *See Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019); *see also Oklahoma L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 563 (S.D.N.Y. 2020). In addition, the Court finds that the Amended Complaint does not set forth sufficient facts alleging scienter, and thus Plaintiffs fail to state a claim as a matter of law as to all of Defendants' alleged misstatements.

## III.    Section 20(a) and Section 20A Claims

As Plaintiffs have failed to adequately allege their § 10(b) claim, the claims under § 20(a) also fail as a matter of law. *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011). Likewise, Plaintiffs' insider trading allegations necessarily fail because they have failed to plead an adequate predicate § 10(b) claim. *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 364 (S.D.N.Y. 2005).

## IV.    Denial of Leave to Amend

SPA-21

A district court is not required to grant leave to amend when it grants a motion to dismiss based on pleading deficiencies. *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 Fed. Appx. 289, 296 (2d. Cir. 2021) (internal citation omitted). Whether to permit a "plaintiff to amend its complaint is a matter committed to a court's "sound discretion." Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." In particular, it is the usual practice to grant at least one chance to plead fraud with greater specificity when a complaint is dismissed under Rule 9(b). Leave to amend should be denied, however, where the proposed amendment would be futile. *In re Barrick Gold Secs. Litig.*, 2015 U.S. Dist. LEXIS 43053, *15-16 (S.D.N.Y., Apr. 1, 2015).

As this Court has previously noted, given Defendants' disclosures regarding the negative conditions at the Nevada Mines and the paucity of allegations supporting Plaintiffs' allegations of falsity, the Court is doubtful that yet another amendment would certainly cure these defects. *See Colbert v. Rio Tinto PLC*, 824 Fed. Appx. 5, 11 (2d. Cir. 2020) (affirming district court's denial of leave to amend in securities mining case).

## <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6) is **GRANTED**. Accordingly, this case is dismissed with prejudice. The Clerk of Court is respectfully requested to terminate the pending motions at ECF No. 130 and to close this case.

Dated:  September 30, 2024
        New York, New York

_____
        **ANDREW L. CARTER, JR.**
        **United States District Judge**

21

SPA-22

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  _11/27/2024_

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT GLUCK, EMMA GLUCK and SARA GLUCK, on behalf of themselves and all others similarly situated, <br><br>            Plaintiffs,<br><br>vs.<br><br>HECLA MINING COMPANY, PHILLIPS S. BAKER, JR., LINDSAY A. HALL, LAWRENCE P. RADFORD, and DEAN W.A. MCDONALD,<br><br>            Defendants. | Case No.: 19-cv-4883 (ALC)<br><br>(Consolidated with Case No.: 19-cv-5719 (ALC))<br><br>[~~PROPOSED~~] JUDGMENT |

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated September 30, 2024 (ECF No. 141) Defendants' motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6) is granted; accordingly, the case is closed.

**Dated: New York, New York**
~~October ___, 2024~~
**November 27, 2024**

SO ORDERED:

HON. ANDREW L. CARTER, JR.
UNITED STATES DISTRICT JUDGE